The action was continued nisi, and, at the last September term in Norfolk, the following opinion of the Court was delivered by
Parsons, C. J.
The action is covenant broken, in which the plaintiff has demanded against the defendant his damages for the breach of certain covenants contained in a deed of conveyance of land in fee simple, with general warranty, executed on the 28th of December, 1801, to the plaintiff, by the defendant and one Henry Brazier, who died before the commencement of the action. The *467 parties agree that the late Moses Gill, Esq., was seised of the premises in fee, and by his last will made his nephew, Moses Gill, his executor * and residuary legatee, and [ * 536 ] that under the residuary devise, the premises were devised to the executor in fee; that the testator died so seised; that his will has been duly proved; that the executor gave bond with sureties to the judge of probate for the payment of the debts of the testator and of the legacies bequeathed in his will; that after the testator’s death, his nephew, by his deed, dated July 18th, 1800, conveyed the premises in fee simple to the said Samuel and Henry Brazier; that afterwards Ward Nicholas Boylston, as administrator with the will annexed of the estate of Thomas Boylston, recovered judgment in August, 1804, against the estate of the said Moses Gill, the testator, for 106,176 dollars, 66 cents, and costs of suit; that on the 19th of September next following, execution on that judgment was levied in due form of law on the premises then in the plaintiff’s possession ; and seisin and possession thereof delivered to the said Ward Nicholas Boylston, the plaintiff making no resistance to the levy; and that thereupon the said W. N. Boylston entered and took possession. If this levy, with the seisin and possession accompanying it, is a lawful ouster of the plaintiff, he must recover his damages, the defendant agreeing in that case to be defaulted; otherwise the plaintiff is to be nonsuit.
The plaintiff, to maintain his action, relies on several statutes of the commonwealth. By the statute of 1783, c. 32, § 1, when the goods and chattels belonging to the estate of any person deceased shall be insufficient to pay his debts and legacies, so much of his real estate as shall be necessary therefor may be sold by the executor or administrator on obtaining license. By the 7th section of that statute, the real estate of any testator or intestate is made liable to be taken and levied upon by any execution issuing on a judgment recovered against an executor or administrator, for any debt due by the deceased, and the manner of the extent shall be the same as in levying executions on other real estates, and the estate may be redeemed by the executor, administrator, or heirs, in like manner (5).
The statute of 1783, c. 57, 2, describes the manner in which executions may be levied on other real estates, and directs * the sheriff, after appraisement, to deliver possession [ * 537 ] and seisin thereof to the creditor.
*468 From the literal construction of these statutes we must conclude that, where lands liable to be taken in execution are legally ex tended on, the judgment creditor is in fact seised and possessed of them; but to this construction it is objected that these statutes ought to have a construction analogous to the law authorizing the extent of lands by an elegit; that after a reasonable extent ascertained by the jury, and the delivery of a moiety of the lands by the sheriff to the judgment creditor, he has not thereby the actual Dossession of the land, but only a right of entry, which he may exercise if he can peaceably, or he must bring ejectment to get the possession.
If the authority of the sheriff in extending an elegit was the same which the sheriff has by our statutes in taking lands in execution, the argument would have great weight; but no act of parliament, or rule of the common law, has made it the duty of the sheriff to put the judgment creditor, suing an elegit, into the possession of the lands. Our statutes direct him expressly to deliver seisin and possession to the creditor. The satisfaction for his debt, which the tenant by elegit receives, is of a different nature from the satisfaction of an execution by an extent on lands pursuant to our statutes. In the former case, the tenant holds the lands at a reasonable extent until his debt be paid; and if prevented from entering by the debtor, at the time of the liberate, still he shall hold the lands from the time when he obtains possession until he is satisfied. In the latter case, the lands, and not the annual profits, are appraised at their true value, and the creditor holds the lands in fee, subject to redemption by the debtor. And the terms of redemption clearly suppose the creditor to have the possession from the time of the levy. For the third section of the act last cited, provides that the debtor may within a year after the extent, and not afterwards, re deem the land by paying to the creditor, or the tenant in possession under his title, the whole debt with interest, with the reasonable charges and expenses of repairing and improving the same, deducting the rents and profits.
[ * 538 ] * It is however urged that if this construction be admitted, when the debtor is the tertenant at the time of the levy, it ought not to be extended to cases where he is not in the actual possession, because the sheriff might levy the execution on lands not the debtor’s, and might dispossess the right owner. It must be observed that our statute provides but one method of levying executions on lands, and by this method the sheriff must deliver seisin and possession to the creditor. If, therefore, the lands taken are liable to the extent, this method it is the duty of the sheriff to pursue. By the levy the creditor is to have a fee simple *469 in the lands, 01, in the words of the statute, as good a title as the debtor had. If the creditor be seised, he must in legal contemplation have the possession, and may maintain trespass against any person who shall invade his possession. The creditor ought also to have a remedy in law to recover seisin by an habere facias seisinam.. To have this remedy, he must be able to maintain a real action, declaring on his own seisin; for a purchaser in fee cannot declare on any seisin but his own, when his title is derived from a tenant in fee. The construction, therefore, which is put on our statutes, must extend to all cases where the lands are liable to the extent, or the creditor, not being seised by virtue of the levy, could have no remedy in law to recover his seisin. If it be said that the creditor, by virtue of the levy, may have a right of entry, and on entering may be seised, like the effect of an elegit, it should be remarked that the cases are dissimilar. The tenant by elegit has only a term, and claims only the possession, and his entry is on the possession ; the tenant of the land is therefore immediately on the liberate a wrongful possessor, and the creditor may enter peaceably without writ, and remove him from the possession (6). In a levy by execution in this case, the creditor claims a fee simple, and if he is not seised by virtue of the extent, the tenant remains seised, and his possession is rightful; and the right of entry, thus supposed in the creditor, must therefore be on a man lawfully seised, and havin0 consequently a rightful possession.
There seems, therefore, no reason for construing the words of the statute, directing the sheriff to deliver seisin and possession * to the creditor against their natural import. But [ * 539 ]' there are further provisions in our statutes on this subject, that remove all color of doubt. The same section last mentioned directs the sheriff, where the execution is levied bn the rents, to deliver seisin to the creditor, and, if the person in possession shall refuse to attorn, to turn him out. of possession, and to give the creditor the seisin and possession ; and the debtor or his assigns are empowered to redeem by paying to the creditor or the tenant in possession under him the remainder of the debt, which shall be due at the time of redemption. And by the statute of 1788, c. 51, $ 3, when an executor or administrator shall recover judgment for any sum of money, the execution on which shall be satisfied by an extent on real estate, the executor or administrator shall be seised and possessed of the real estate to the use of the persons interested in the judgment.
As to the inconvenience suggested, it can have weight in the *470 construction of a statute but in doubtful cases. But the inconvenience does not arise from the construction which we give to oui statutes. The plaintiff has a right to nave his execution levied on lands of the debtor whether living or deceased, and on those lands only is the sheriff authorized to levy his execution. If he take other lands, he is a trespasser, and neither he nor the creditor can be protected by the execution. If the right owner, not being the debtor, be dispossessed, the act is tortious, and he may maintain trespass against the creditor and the sheriff, or he may bring his writ of entry against the creditor as a disseisor, or he may immediately reenter and defeat the disseisin (7). The inconvenience supposed may be the same in levying an execution on chattels. The sheriff may seize goods not the debtor’s, or in a copias ad satisfaciendum, he may arrest the wrong person. In all these cases he cannot justify under the execution, but must answer for the ties pass (8).
Our opinion is, that when an execution is regularly levied on lands liable by law to the extent, whoever may be the tenant, and duly returned and registered and- possessiomdelivered by the sheriff * the creditor, he is to be considered as in the actual seisin and possession, and may by virtue thereof either maintain a real action declaring on his own seisin, or he may maintain trespass [ * 540 ] against the tenant, who shall * continue his possession without the creditor’s consent, or may reenter on him after the levy is completed (9). And if this opinion be correct seisin delivered the creditor on such levy is a legal ouster of the tenant from the land.
We have considered this point more fully than seems necessary for the decision of this cause. It is stated in the case that the tenant, believing the land's liable to the extent, and, not choosing to be involved in a fruitless and expensive lawsuit with the creditor, did not resist his levy, but. suffered him to enter under it. If, therefore, the creditor was not ipso facto seised by virtue of the levy, yet if he had any right under the extent, it must be a right to enter peaceably, and acquire a seisin. A seisin thus lawfully acquired by a rightful and peaceable entry must amount unquestionably to an ouster of the tenant.
The defendant’s counsel appear to have very fully considered the whole case ; and they have argued that the lands in question were *471 not liable by law to the extent. If this argument be well founded r the defendant must have judgment; for the ouster of the plaintiff by Boylston will not be lawful, but a disseisin, and so no breach of the defendant’s warranty.
The argument was supported on two grounds; one was, that the statute authorizing the levy of executions on the lands of persons deceased, gives the right of redemption to executors, administrators and heirs, without including devisees or the assigns of heirs or devisees. And that in the present case the devisee had, for a valuable consideration, bona fide aliened the lands in fee. And if the lands are still liable to an extent to satisfy the debts of the deceased, they will always remain liable, which would be a general inconvenience; for no man would ever venture to purchase of an heir or devisee, or of their assigns.
The other ground was, that the executor of Moses Gill, who was the residuary legatee, and under whom the plaintiff claimed, had given bond with sureties to the judge of probate for the payment of all the deceased’s debts, and of the legacies he had bequeathed, and that by virtue of this bond the lien on the testator’s real estate was discharged.
It is the duty of the Court so to construe the statute that it may have a reasonable effect, agreeably to the intent of the * legislature. Immediately on the death of the testator, [ * 541 ] the devisee may be seised of the land devised, and if it be not liable for the debts of the testator in his hands, the statute would be nugatory in its application to testate estates; and as heirs expressly have a right to redeem, it is admitted that lands in their hands may be taken in execution. But no good reason can be assigned why devisees, whose estates are derived from the bounty of the testator, should be favored rather than heirs, who hold by operation of law.
With respect to the assignees of heirs and devisees, it may be observed that by the statute of 1788, c. 66, § 2, no action can be maintained against an executor or administrator by a creditor, to recover his debt due from the deceased until a year after his death; and in that time an heir or devisee can easily learn whether there be a deficiency of personal assets, and can bona fide aliene the lands he claims from the deceased. If such alienation was to discharge the lien on the lands, the statute would be rendered useless, whether the deceased left a will or died intestate. And certainly the statute ought to have a construction as beneficial to creditors as a devise to executors of an authority to sell lands for the payment of debts ; and in that case it is held that a descent from, or an aliena *472 tian by devisees does not take from executors the power to sell the lands (10).
A bona fide alienation for valuable consideration by a devisee has been compared, by the counsel for the defendant, to a case where a fraudulent purchaser has afterwards bona fide and for valuable consideration conveyed; in which case the last purchaser shall hold the land purged of the fraud (11). But the two cases are not alike in principle, for the consideration money received by the devisee cannot be personal assets in the hands of the executor.
Whether the devisee, or the assigns of the heir or devisee, can redeem, it is not necessary now to determine. Perhaps, on examination, it will be found that every tenant of the land lawfully holding under the deceased may, within the equity of the act, redeem, on the terms of paying the debt, for which the lands were taken. But on this point we give no opinion.
[ * 542 ] * As to the inconvenience resulting from a perpetual lien on the deceased’s lands for the benefit of his creditors, we are not disposed to say that the lien is perpetual. Certainly it ought tó continue a reasonable time, and should not be defeated but by the neglect or loches of a creditor. What shall be deemed a reasonable time, has not, that we know of, been determined. In the case of Lee vs. Gallison, in Essex, Gallison, a legatee, had lain by for more than twenty years, and the lands had descended to the heirs of a devisee. Under the circumstances of that case, the Court held that the lands were discharged of the lien. If a rule were now to be established, perhaps, in analogy to various other maxims of law, twenty years of negligence in a creditor might be a period of time which should liberate the lands from the lien created by the statute. But of this point also we give no opinion (12).
As to the inconvenience suggested, that the lands, when once extended on, and redeemed, may be afterwards taken in execution by another creditor, the inconvenience does not exist. For when the lands have been once legally appropriated for the payment of the deceased’s debts, they are forever after discharged, on the same principle that his goods and chattels, when sold upon fieri facias, cease to be assets in the hands of his executor or administrator.
The last objection that remains to be considered, is grounded on the probate bond given in this case for the payment of debts and *473 legacies. And if the giving of this bond is in law a discharge of the testator’s lands from the lien imposed upon them by the statute, the defendant must recover.
But we are all of opinion that this bond is no discharge of the lien. Before the provincial statute of 1 & 2 Ann. c. 5, all execu tors were bound to inventory and account for the testator’s estate This was necessary to furnish the creditors and legatees with evidence to charge them with waste, if any assets were embezzled or unaccounted for. When the legacies are specific, or to be ascertained without inventory or account, and the executor be the residuary legatee, if the legatees and creditors can be secured, there can be no occasion for an inventory or account. In this case that statute relieves the executor from this duty, on his giving bond with sureties to * the judge of probate for the [ * 543 ] payment of the debts and legacies. On this principle also the 17th section of the statute of 1784, February 6, c. 24, was passed. This section has no application to the lien on the testator’s estate, real or personal: This lien remains in full force, and the benefit to be derived by a creditor or legatee from the bond is merely cumulative.
Upon the best consideration we have been able to give this case, we are all satisfied that the levy by Boylston was a legal ouster of the plaintiff, and breach of the defendant’s covenant of warranty, and that the plaintiff must recover his damages sustained by that breach.
After this opinion was delivered, the parties consented that the Court should assess the damages, agreeing that the true value of the land at the time of the conveyance from Brazier to Gore was 9000 dollars, and at the time of the ouster 15,000 dollars. And now, at this term, the Chief Justice, and Sewall and Parker, Justices, being present, the following decision of the Court, on the damages to be assessed, was pronounced by
Parsons, C. J.
The Court have considered of the rule by which damages in this case are to be assessed. In a personal action of covenant broken, damages are demanded for the breach of a warranty by an ouster of the purchaser, by a right or title paramount. The plaintiff insists on the value of the lands at the time of the breach; and the defendant contends that the value when conveyed is the measure of the damages.
By the ancient common law the remedy on a warranty was by voucher or warrantia chartre, and the recompense recovered in those suits was other lands to the value at the time the warranty was made. This was the general rule; but when the warrantor, on being *474 vouched, entered into the warranty generally, he was bound to render other lands to the value of the lands lost at the time he entered into the warranty (13). In valuing the land lost, when the vouchee entered into the warranty specially, no regard was had to any improvements made by the tenant, as by erecting edifices, or turning pasture into arable land ; nor was the discovery [ * 544 ] *of a mine in the land lost, after the warranty was made, but then not known, considered in ascertaining the value of the land to be recovered in recompense.
An effect originating in this feudal principle may be discovered in this state in the assignment of dower against a purchaser. When the husband alienes with warranty during the coverture, and after dies, his widow shall not be entitled to the benefits of the improvements made by the purchaser, because he could not recover their value in other lands against the heir on the warranty of the husband (14). This rule is now supported in this state on principles of public policy, that purchasers may not be discouraged from improving their lands. If the lands have greatly risen in value, not from any improvements made upon them, nor from the discovery of any new sources of profit, but from extrinsic causes, as the increase of commerce or population, it may be a question whether, on the extendi ad ralentiam, the lands to be recovered in recompense would be valued at the increased price, so that the quantity might be proporfionably reduced. This is here a question of mere curiosity, unless it should be considered as relating to the lands to be assigned to the widow for her dower. If the husband during the coverture had aliened a real estate in a commercial town, and at his death the rents had trebled from various causes unconnected with any improvements of the estate, and the widow should then sue for her dower, perhaps it would be difficult for the purchaser to maintain that one ninth part only, and not one third part, should be assigned to her.
This remedy, to recover a recompense in other lands to tne value, existed very anciently, when the principal consideration received on the alienation was the services to be performed by the tenant. The remedy might then be proper, as any improvements of the land thus paid for in services must redound wholly to the advantage of the tenant, as his services to the lord remained the same. But when lands were aliened for money when improve ments in agriculture became an important object of public policy, *475 and when the alienor might have no other lands to render a recompense in value, it became expedient that another remedy for the purchaser *on eviction should be allowed. And [ * 545 ] it is certain that, before the emigration of our ancestors, the tenant, on being lawfully ousted by a title paramount, might maintain a personal action of covenant broken on a real covenant of warran y (15).
This remedy was adopted by our ancestors as early as remedies for evictions of land sold with warranty were necessary. And in a personal action of covenant broken, it is a general rule of law, that such pecuniary damages be recovered, as shall be an adequate compensation for the injury sustained, by the breach of the covenant. When this action was admitted to recover satisfaction for the breach of a real covenant of warranty, the same measure of damages was adopted, as is used in other personal actions of covenant broken, which does not vary in principle from the rule on voucher, where the vouchee entered generally into the warranty. And the general practice has been to give a sum of money in damages equal to the value of the land at the time of the eviction, which was a breach of the covenant, and sometimes with interest on that sum, according to the circumstances of the case. In the first settlement of the country, the value of the land consisted chiefly in the improvements made by the tenants; and if on ouster the warranty would not secure to him the value of his improvements, he could derive little benefit from it.
In the case of L&prilette vs. Rand, in Suffolk, it was ruled by the Court that the plaintiff should recover the value at the time of the eviction, which greatly exceeded the value of the land when it was sold by the defendant. And in a case in Essex, the name of which is not recollected, the rule for assessing the damages was reserved by the parties, on a case stated, for the consideration of the Court, who determined that the law was settled that the plaintiff should recover in money the value at the time of the eviction. And in a late case where Bosson, who held under the commonwealth, was evicted by Martin, the lands were appraised at their value at the time of the eviction, which value was paid to Bosson by order of the legislature.
* The Court are of opinion, conformably to the prin- [ * 546 : ciples of law applied to personal actions of covenant broken, to the ancient usages of the state and to the decisions of our predecessors, supported by the practice of the legislature, tho the plaintiff m this action ought to recover in damages the value of *476 the estate at the time of the eviction. And as the parties have agreed that the true value at that time was 15,000 dollars, the plaintiff must have judgment for that sum.
As the plaintiff admits that immediately on the eviction he paid that sum to Boylston, and received back the estate, and has been ever since in the receipt of the rents, he can have no claim for interest as a compensation for any intermediate loss of profits (16).

 [ Wyman vs. Brigden, 4 Mass. 150.—Drinkwater vs. Drinkwater, 4 Mass. 354.-Bigelow vs. Jones, 4 Mass. 512.—Boyden vs. Carver, 4 Mass. 598.—Boylston vs. Carver, 4 Mass. 590.—Michell vs. Lunt, 4 Mass. 654.—Scott vs. Hancock & Al. 13 Mass. 162.—Ed.]

 3 Term Rep. 295.

 [Burnell vs. Burnell, 9 Mass. 96. 11 Mass. 163.—Tate vs. Anderson, 9 Mass. 92.—Ed.]

 [Commonwealth vs. Kennard Al. 8 Pick. 133.—Ed.]

 [Barrett vs. Porter, 14 Mass. 143.—Proctor vs. Newhall, 17 Mass. 81.—Langdon vs. Potter & Al. ante, 215.—Wyman vs. Brigden, 4 Mass. 150.—Bigelow vs. Jones, 4 Mass. 512.—Ed.]

 [Drinkwater vs. Drinkwater, 4 Mass. 354.—Ed.]

 [State of Connecticut vs. Bradish, 14 Mass. 296.—Trul. vs. Bigelow, 16 Mass 406.-Ed.]

_ (12) [Wyman vs. Brigden, 4 Mass. 150.—Ed.]

 Vin. Abr. Title Voucher, T. pl. 1, 2,3.—Ibid. Title Warranty, K. pl. 11.

 [Ayer vs. Spring, 10 Mass. 80.—Catlin vs. Ware, 9 Mass. 218.—Well vs. Townsend, 1 Pick. 21.—Ayer vs. Spring, 9 Mass 8, and note to 3d edition.—Thomson vs Morrow, 3 Serg. & R. 289, 3 Mason, R. 375.—Dorchester vs. Coventry, 11 Johns. 510 —Wright vs. Jennings, 1 Baily, R. 281.—4 Kent. Com. 282.—Ed]

 1 Brownl. 21.—2 Brownl 164,165.

 [Bigelow vs. Jones, 4 Mass. 512.—Chapell vs. Bull, 17 Mass. 213.—Administrators of Wallis vs. Administrator of Cook, 1 M’Cord. R. 467.—Ela vs. Card & Al 2 N. Hamp. R. 175.—Mitchel vs. Hazen, 4 Conn. 496.—Bonta vs. Miller, 1 Little, 250.— Marshall’s Heirs vs. M’Connall's Heirs, 1 Little, 419.—Cummins vs. Kennedy, 3 Little, 125.—Stevenson & Al. vs. Harrison, 3 Little, 174.—Caswell vs. Wendell, 4 Mass. 108.— Dimmick vs. Lockwood, 11 Wend. 149.—Stubbs vs. Page, 2 Greenl. 378.—Bond vs. Qualtlebaum, 1 M'Cord, 586.—Stewart vs. Drake, 4 Halsted, 139.—Marston vs. Hobbs 9 Mass. 433.—Bickford vs. Page. 2 Mass. R. 455.—Ed.]